**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------X

| | |
|---|---|
| KATHLEEN MARTIN, | : |
| | : |
| Plaintiff, | : |
| | : **COMPLAINT** |
| v. | : |
| | : |
| CITIBANK, N.A., and ANAND SELVA, | : **Jury Trial Demanded** |
| | : |
| Defendants. | : |

----------------------------------------------------------------X

Plaintiff Kathleen Martin ("Martin" or "Plaintiff"), by and through her attorneys, Wigdor LLP, as and for her complaint against Citibank, N.A. ("Citi" or the "Bank"), and Anand Selva ("Selva") (collectively, "Defendants"), hereby alleges as follows:

## PRELIMINARY STATEMENT

1.      In 2020, the Office of the Comptroller of the Currency ("OCC") assessed an enormous $400 million penalty against Citi because of the Bank's "serious and longstanding" unlawful data governance practices.  The Bank also entered into a binding Consent Order with the regulator setting forth specific remedial measures to cure its legally deficient practices.

2.      To that end, in late 2021, Citi hired Martin, a data governance expert who has worked with some of the top financial institutions, to help Citi revamp its data processes and avoid further legal jeopardy.  Citi hired the right person.  According to the Bank's internal documents, Martin was an "exemplary" performer who "exceed[ed] expectations."  Even Jane Fraser, Citi's Chief Executive Officer ("CEO"), gushed over Martin's work, stating that she had received "terrific feedback" about Martin, and praising Martin's "gravitas" and her ability to build "strong relationships" at the Bank.

3.      That all changed when Martin protested Citi's attempts to file false information with the regulators.  Specifically, Martin's supervisor and Citi's Chief Operating Officer ("COO") Selva wanted Martin to hide from the OCC critical information about the Bank's data governance metrics because, according to Selva, the information would make the Bank "look bad."  Selva also urged Martin to falsely tell the regulators that Citi had achieved particular goals when, in fact, it had not.  The more Martin pushed back against this unlawful activity, the worse things got.  Ultimately, the Bank fired Martin in retaliation for her protected complaints.

4.      Defendants' conduct violated the Sarbanes-Oxley Act of 2002 ("SOX"), 18 U.S.C. § 1514A, which prohibits retaliatory actions against employees like Martin who make legally protected complaints.

## PARTIES

5.      Plaintiff Kathleen Martin was a Managing Director at Citi from November 1, 2021, to November 3, 2023, when Citi unlawfully terminated her employment.  At all relevant times, Martin was an "employee" of Citi.

6.      Defendant Citibank, N.A., was, at all relevant times, Martin's "employer."

7.      Defendant Anand Selva was, at all relevant times, an officer, employee or agent of Citi.

## ADMINISTRATIVE PROCEDURES

8.      Martin filed a Complaint with the U.S. Department of Labor's Occupational Safety & Health Administration ("OSHA") on November 14, 2023.

9.      More than 180 days have passed since Plaintiff filed her Complaint with OSHA and no final decision has been issued with respect to the allegations in her Complaint.

10.     Accordingly, Martin is entitled to seek *de novo* review of her allegations in federal court.  18 U.S.C. § 1514A(b)(1)(B).

11.     Any and all other prerequisites to the filing of this suit have been met.

### FACTUAL ALLEGATIONS

I.     **CITI'S UNLAWFUL DATA GOVERNANCE PRACTICES**

12.     In or about 2019, the OCC notified Citi that it intended to initiate "cease and desist proceedings" against the Bank, including filing charges, because of "deficiencies in [the Bank's] data governance, risk management, and internal controls that constitute unsafe or unsound practices . . . that contributed to violations of law or regulation."

13.     In early October 2020, the OCC assessed a $400 million civil money penalty against Citi for these violations.[1]

14.     The OCC found that Citi had engaged in "unsafe or unsound practices with respect to the Bank's data quality and data governance, including risk data aggregation and management and regulatory reporting."  Exhibit A, Article II(4).

15.     The OCC further "determined" that the Bank's "Board and senior management" had not engaged in sufficient "oversight" to "correct the serious and longstanding deficiencies and unsafe or unsound practices."  Exhibit A, Article II(5).

16.     These were not singular violations.  Rather, the OCC found that the Bank had engaged in a "pattern of misconduct" that included prior "violations of laws and regulations." Exhibit A, Article II(6) and (7).

---

[1]     Exhibit A is a copy of the order levying the fine against Citi.

17.     To "avoid additional costs" and further "administrative and judicial proceedings," the Bank entered into a Consent Order detailing measures to remedy these legal violations.[2]

18.     Article V of the Consent Order required that Citi "perform an analysis" to "identify all gaps between the Bank's current data governance state and the ongoing and planned corrective actions required to address" the legal violations.  Exhibit B, Article V(1).

19.     Article V also required that Citi "submit a report" to the OCC identifying these "gaps" as well as a "Program" to ensure that the Bank's "data . . . is accurate, consistent, timely and complete."  Exhibit B, Article V(1) and (2).

20.     As part of Citi's continuing legal obligations to the OCC, Article III required that the Bank regularly report to the OCC data "metrics that are accurate and meaningful."  Exhibit B, Article III(2)(a).

21.     The OCC directed Citi to "expeditiously undertake all necessary and appropriate actions to achieve compliance with th[e] [Consent] Order," and remedy the underlying "unsound practices and violations of law."  Exhibit B, Article XVI(1).

22.     Importantly, the Consent Order did not end Citi's legal jeopardy.  Rather, the OCC "expressly reserve[d] its right to assess future civil money penalties, or take other supervisory and/or enforcement actions, including in circumstances where the OCC determines that the Bank is not making sufficient and sustainable progress towards achieving compliance with th[e] [Consent] Order."  Exhibit B, Article XVI(1).

23.     Moreover, Citi's legal obligation to the regulator would continue "until it ha[d] adopted, implemented and adhered to all of the corrective actions set forth in each Article of

---

[2]     Exhibit B is a copy of the Consent Order.

th[e] [Consent] Order, the corrective actions are effective in addressing the Bank's deficiencies; and the OCC has verified and validated the corrective actions."  Exhibit B, Article XVI(5).

24.     At the same time, the "Federal Reserve Board took separate but related action against Citigroup, the bank's holding company," to remedy these "long-standing" legal violations.[3]

## II.     THE BANK HIRES MARTIN

25.     Citi recruited Martin into a leadership role to help Citi clean up its unlawful data maintenance practices and avoid further legal liability.

26.     Martin is an accomplished data management executive with extensive experience as both a business leader and COO with a successful track record of leading large-scale organizations.

27.     Prior to joining Citi, she worked at some of the largest financial institutions in the world, including as Managing Director, Chief Operating Officer, Enterprise Data and Services, for Morgan Stanley and as Chief Operating Officer, Enterprise Data Management, for GE Capital.  Immediately before Citi hired her, Martin served as Managing Director, Global Technology Chief of Staff, for JP Morgan Chase ("JPMC").

28.     At the time, Martin was hesitant to leave her secure position with JPMC. However, Citi represented that her role with the Bank would be a long-term leadership position, and Martin knew that it would take the Bank many years to come into full compliance with the Consent Order.

29.     Martin agreed and, on or about November 1, 2021, started working as a Managing Director, Data Chief Administration Officer and NAM Chief Data Officer within Citi's Chief

---

[3]     Exhibit C is an October 7, 2020 news release by the OCC.

Administrative Office, reporting directly to Rob Casper ("Casper"), Citi's Data Transformation

Chair.

## III.   MARTIN'S PERFORMANCE IS "EXEMPLARY" AND "EXCEEDS EXPECTATIONS"

30.   Martin was, according to the Bank's internal documents, explicitly rated as an

"exemplary" performer.

31.   In March of 2022, Martin led a small team that crafted a pre-submission plan for

Citi's Board, outlining how the Bank would come into compliance with Article V of the Consent

Decree.  That pre-submission plan ultimately became Citi's September 15, 2022 submission to

the OCC—a detailed plan to satisfy the Bank's continuing legal obligations to the regulator.  The

plan consisted of several hundred pages, over 1,000 milestones, 9,000 deliverables, and this

success resulted in Martin's promotion to an even more important role at Citi.

32.   By the summer of 2022, after considering both internal and external candidates,

and after Martin interviewed with several members of Citi's Board and CEO Fraser's Executive

Management Team ("EMT"), Citi asked Martin to take over for Casper as the Data

Transformation Chair.

33.   On or about September 26, 2022, Citi announced Martin as the new Interim Data

Transformation Chair reporting directly to Karen Peetz ("Peetz"), the Bank's Chief

Administrative Officer ("CAO").

34.   Peetz explained to Martin that the "interim" status was merely a formality, as

Peetz explained that Citi required such label when an internal candidate elevates their reporting

line to an EMT[4] member.  Citi CEO Fraser had a practice of using the "interim" title to "ease"

---

[4]      The EMT consisted of Faser's direct reports.

high-level executives into their new role.  Peetz gave Martin examples of other executives who had their interim titles lifted after three-to-five months.

35.     In the last quarter of 2022, Martin continued to interact with regulators to keep Citi out of legal jeopardy.  For instance, she held 10 meetings with the OCC and satisfactorily responded to more than 325 questions from the regulator about the transformation of the Bank's data governance practices.

36.     On January 23, 2023, Martin received her annual review for 2022.

37.     Not surprisingly, she earned ratings of "exemplary" and "exceeds expectations."

38.     For example, Martin was rated as a leader who "exceeds expectations."

39.     Martin's "engagement" score was rated above her peers, both within the CAO group and the Bank as a whole.

40.     Citi praised Martin for her "interpersonal skills," which were deemed "some of the strongest" because of her ability "to build and develop relationships around large financial institutions with apparent ease."

41.     Martin earned an "exemplary" rating for her leadership and contributions to Citi's data transformation plan.

42.     One reviewer observed that "[i]n very short order, [Martin] has come into the bank . . . made the right initial connections and has been a 'force for good.'"

43.     Another noted that Martin "has a no-nonsense style and is clear in thought but open for input and collaboration."

44.     Martin's "Client & Franchise Outcome Rating" was also "exemplary."

45.     Further, Citi rated Martin as "exceeds expectations" for her "financial performance," having achieved her goals while coming in $1.2 million under budget for her group.

46.     Overall, the Bank praised Martin for being "the right person at the right time to lead the Data Transformation Program.  She knows the plan, knows how to manage and execute a program (even a super complex one), understands the importance of – and surrounds herself with – the right people, and knows where she may need help."

47.     On January 30, 2023, Fraser wrote that she received "terrific feedback from the lead directors[5] in your [Martin's] interaction with them," and gushed over Martin's "gravitas" and Martin's ability to build "strong relationships," praising "[t]he time [Martin] invested [as] smart and effective."

48.     Put simply, Martin had become the "face" of Citi's efforts to lead the Bank's data transformation in the eyes of the regulators, Citi's Board of Directors, Citi's CEO and the entire Executive Management Team.

## IV.    CITI RETALIATES AGAINST MARTIN

49.     On or about March 27, 2023, Citi promoted Selva to become the Bank's new COO, replacing Peetz.

50.     Selva became Martin's direct manager.

51.     Almost as soon as he was promoted, Selva began to urge Martin to make false reports to the Board, which would be transmitted electronically to the OCC under the Consent Order.

---

[5]     The lead directors consisted of a subset of the Board of Directors.

52.     Specifically, on May 12, 2023, Martin held a meeting with Selva about a metric designating "Authoritative Data Sources" ("ADSs") within the Bank as required by Article V (2)(d)(iv) of the Consent Order.  Pursuant to the Article V plan, as approved by the OCC, a key deliverable was designating an ADS for each set of unique data.  To demonstrate the Bank's progress, Citi developed a specific metric that would show the designation of each ADS data set.

53.     Martin sought to accurately report to the OCC, the Board, and the EMT such metric reflecting, as expected, that the Bank had not yet made substantial progress designating ADSs as required by the Consent Order.

54.     Selva, however, wanted Martin to misreport the data.  He was concerned that by reporting the ADS designations accurately, Citi would "highlight gaps," which would be a "bad thing."  According to Selva, "we don't want the regulators to know that we have, say, 90% gaps."

55.     Martin was highly concerned that the failure to report this data accurately was a violation of the Consent Order, including Citi's obligation to identify and report "gaps" under Article V(1) and (2), as well as its obligation to report to the OCC "metrics that are accurate and meaningful" under Article III(2)(a).

56.     Martin protested to Selva that the Bank had to report this metric accurately and, over Selva's objection, included the metric in the report to the OCC.

57.     Shortly thereafter, Selva retaliated against Martin for protesting his unlawful request and accurately reporting the Bank's continued "gaps" in this area.

58.     Selva informed Martin that he would not be lifting Martin's "interim" title, in direct contravention of the promises previously made to Martin.  Selva falsely claimed there was no agreement or commitment by Citi to do so.  (In fact, Human Resources ("HR") confirmed to

Martin the existence of emails from Peetz, Selva's predecessor, referencing the Bank's commitment to Martin.)

59.     When Martin protested, Selva began to dissemble and attempted to justify his decision not to give Martin the permanent title by stating that it was a "very big role," falsely suggesting Martin could not perform the job.

60.     However, as Martin explained, she had been performing the job "for almost a year now."

61.     Moreover, Citi's internal documents proved that Martin had "exceeded expectations" in that role and her performance was "exemplary."

## V.     MARTIN REFUSES TO FALSIFY DATA A SECOND TIME

62.     On or about September 7, 2023, Martin met with Selva to discuss additional reporting to the OCC pursuant to Article III of the Consent Order, which required that Citi report "meaningful and accurate data quality metrics" to the Board and, ultimately, the OCC.

63.     The OCC required that Citi comply with Article III by September 2023.

64.     Under the reporting methods that had been developed, the Bank was required to report a "data governance health score" to the Board and the regulators under a color-coding system.  "Green" represented that the goal had been achieved and "red" represented that the Bank had not yet delivered the goal.

65.     Martin told Selva that the output of the data governance health score was low, as expected, because the data was not yet "under governance" as required by Article V, and therefore had to be reported as "red."

66.     Selva refused, explaining, "I don't think we can show this" because it "makes us look bad" to the regulators.  He left the meeting, stating that he would have to "think about it."

67.     Shortly thereafter, on or about September 11, 2023, Selva told Martin that she should report the metric as "green."  He then discussed how to manipulate the data to make it appear as if the Bank had achieved a "green" status, when it, in fact, had not.

68.     Martin protested because she believed that doing so would be misleading and unlawful.

69.     Selva then began to question whether the Bank should report the metric at all, asking, "who is asking us to do this" and "why do we have to use this metric."

70.     Martin responded that the reporting of this metric was specifically required by the Consent Order (Article III and V) and that, as Data Transformation Chair, she was not comfortable reporting a false data governance health score.

71.     Ultimately, Martin refused to follow Selva's directives that she either falsely report the metric as "green" or not report it all.  Rather, she accurately reported the metric to the Board and regulators as "red," even though doing so arguably meant that the Bank was not yet in complete compliance with the Consent Order, as expected by the timing of the agreed-to deliverables.

72.     Martin reported to HR that Selva wanted her to report false data so that the Bank would not "look bad" to the regulators.

73.     The HR representative stated that she would have to report Martin's complaints.

## VI.   CITI RETALIATES BY FIRING MARTIN

74.     On September 25, 2023, less than two weeks after refusing Selva's efforts to misreport a key metric to the Board and regulators, Selva fired Martin.

75.     According to Selva, "key stakeholders" did not think that Martin could be the Data Transformation Chair and the Bank needed "better leadership."

76.     In fact, as explained above, prior to engaging in protected activity, Citi rated Martin as "exemplary" and "exceeds expectations" with respect to her leadership skills and, as the Bank's internal documents show, Martin was deemed the "right person" to lead the "Data Transformation Program."

77.     Citi subsequently modified its reason for terminating Martin's employment, later claiming that Martin purportedly had deficits in "engagement."

78.     Once again, this explanation was false.  Prior to engaging in protected activity, the Bank rated Martin's "engagement index score" as "ahead" of others in her group and the Bank overall.

79.     Citi subsequently changed its explanation for firing Martin yet again, this time claiming that Martin's "position" had been "eliminated."

80.     In fact, the Bank replaced Martin with Japan Mehta, an Indian man who is far less qualified than Martin for the role.

## FIRST CAUSE OF ACTION
### (Violation of SOX)
#### *Against All Defendants*

81.     Martin hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

82.     By the acts and practices described above, Defendants retaliated against Martin for engaging in protected activity in violation of SOX.

83.     As a direct and proximate result of Defendants' unlawful retaliatory conduct, Martin has suffered, and continues to suffer, harm, including, but not limited to, lost wages, restricted future employment opportunities, humiliation, embarrassment, reputational harm,

emotional and physical distress, mental anguish, and other economic and compensatory damages.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendants for the following relief:

A.      Reinstatement with the same seniority status that Martin would have had, but for the retaliation;

B.      Back pay, including bonuses (including but not limited to the stock units and/or cash value of any securities or the like that would have been granted as part of her compensation), various performance-based compensation, deferred compensation, benefits, reinstatement (including of seniority and tenure), and all other remedies necessary to make Martin whole;

C.      An order requiring Defendants to abate and refrain from any further violations of the whistleblower provisions of SOX;

D.      An order prohibiting Defendants from disclosing any disparaging information about Martin to prospective employers, or otherwise interfering with any applications she might make in the future;

E.      Compensatory monetary damages in an amount determined to be fair and equitable compensation for Martin's physical and emotional distress and loss of reputation;

F.      Reasonable attorneys' fees for Martin's attorneys and the costs of this litigation, including but not limited to reimbursement of all costs, including but not limited to deposition fees, witness fees, travel expenses, and other expenses to present, collect and produce evidence in this matter; and

G.      Any and all other appropriate relief.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated:  May 22, 2024
        New York, New York

**WIGDOR LLP**

By: _____
      Douglas H. Wigdor
      Valdi Licul
      William Baker

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
dwigdor@wigdorlaw.com
vlicul@wigdorlaw.com
wbaker@wigdolaw.com

*Counsel for Plaintiff*

14